Noah Allison v. Appellant David Smallwood I'd like to reserve three minutes if possible for rebuttal argument. Do you have your clock in front of you? Yes, I do. And when you run out of time, you'll be out of time. Okay. Whenever you sit down, you get to keep whatever is left. Okay, thank you. We're here this afternoon on what I think is a very important and very interesting case. The crux issue is whether or not an individual who publishes a safety newsletter and is fired for doing that violates the public policy of the state. This case is here on a summary judgment motion. Judge Mahan ruled as a matter of law that the case was preempted. The case was also barred by the statute of limitations. And impliedly, he held that the public policy tort doesn't go that far, which is the D'Angelo v. Gardner case. I'm going to start with the preemption argument, and then I'm going to move on to the statute of limitations argument and then conclude with my thoughts on the public policy tort itself. Turning to the preemption argument, the question that this Court has to decide today is whether or not this case is preempted under the LMRA, the NLRA, or the Garmon Doctrine. I think the case of Page v. Henry J. Kaiser Company is directly on point on this issue, and that's the citation is 826 F. 2nd, 857. In that case, this Court held that when an individual brings a cause of action for safety concerns, the case is not preempted by the NLRA or the LMRA or Garmon. In the Page case, employees were terminated after they refused an order from the employer to fill generators with gasoline under unsafe conditions. There was a collective bargaining agreement in effect in this case. That didn't happen here, right, according to your allegations? No, Your Honor. He got fired for complaining. He was fired. He was complaining about the safety issue, but complaining. It's not for refusing to do something that was against public policy. That's correct. That's a distinction. That's the distinction from the Page case. It's a distinction, right? Yes, it is. That is a distinction. Page isn't quite on all fours. Well, Page is not. I don't really see how we could say, look, we don't force people to do things that are against public policy, but complaining is a different thing. He can stop talking if he doesn't want to, and there's no public policy that requires him to keep speaking out. Well, Your Honor, there's actually the D'Angelo case, which is a – Is there? I'm sorry? Is there a policy that requires him to publish a newsletter or to speak out? There is a policy. Requires him to speak out? No, not that – He couldn't, without violating public policy, have just kept quiet? No, there is not. There is no public policy that forced him to write this newsletter. Whereas the employees in Page would have been required to do something that itself violated public policy if they had obeyed the order. Well, the Page case is one half of the public policy that's stated in D'Angelo. The first half of the public policy in D'Angelo says it violates public policy to be told to do something unsafe and refusing to do it. The other half of the public policy in the D'Angelo case – And that part doesn't apply to your client? The second half – no, the part I just said does not apply to my client. Okay, so you let off with the part that doesn't apply to your client. Right, that's what I just – that's right. Okay. The part that does apply to my client is it violates public policy to be terminated for seeking a safe and healthy working environment. And that's exactly what we – Where does that come from? What's that? Where does that come from? That comes from the D'Angelo v. Gardner case, which is the Nevada case that sets forth the public policy upon which the tortious discharge claim is based. And what precisely is the public policy? The public policy is, as the D'Angelo court stated, the purpose of NRS 618.015 would be substantially undermined if employers were permitted to discharge employees for protesting working conditions which they believed constituted a hazard to their own health and safety or the health and safety of others. Is there anything in Nevada's jurisprudence or in the statutes that would suggest that this is more limited and closer to the Page case that Judge Kuczynski was asking about? That is, Mr. Smallwood here was engaged in publishing a newsletter on and on and on and on. I mean, this is just an ongoing enterprise, not complaining about a particular condition for which he might have been terminated. He's the foreign and management side. That's pretty clear. And you can conceive of situations, not necessarily Mr. Smallwood's, but you certainly can conceive of situations in which an employee would be stirring people up on an ongoing basis. Is that all protected by public policy in Nevada? It is protected in the sense that as long as he's seeking a safe and healthy working environment, and that's what our argument that the newsletter does. The newsletter is a document that seeks a safe and healthy working environment. Now, the district judge didn't get to the question of whether there was actually a cause of action stated under Nevada law. He just said it was preempted. Well, he said it was preempted and it was barred by the statute of limitations. That's right. Now, I think Page helps you in a conclusion that is not preempted under Section 301. Page doesn't do much for you one way or the other on Garmon, or does it? Well, there is a comment in the Page case that says under the facts in Page, the Garmon analysis was not even relevant to the case. And I saw that comment. That strikes me with all due respect to my colleagues as incorrect. Okay. That is to say, he says, listen, he's a master of his own complaint. He only pledged state law. Therefore, Garmon doesn't apply. But that can't be right. That is to say, Garmon is preemption of state law, and to the extent Garmon applies, if it were to preempt, it would preempt. The fact that you pledged state law doesn't get you out from under preemption. That's what brings you in under preemption. Well, there are exceptions to the Garmon doctrine, and those were enunciated in a, and I'm going to refer to a state case that was in our briefs. It's called Brundridge v. Floor Federal Services, Inc. And in that case, they held that the Garmon preemption was not appropriate in that case because the public policy tort touched matters of clear local interest. And that is exactly what Brundridge is, a case almost is very similar to Page in that pipe fitters were ordered to install some pipes at a nuclear waste facility, and the pipes were underrated. And when they protested installing the pipes, they were told to either install them or you're fired. And when they refused, they were fired. It's very similar to the Page case. And that court held that the Garmon preemption was not appropriate in that case. Also, turning to Nevada itself. If I can stick with this same Garmon question. Sure. The Eighth Circuit in Platt v. Jack Cooper Transport seems to be fairly closely on point and would hold that there is Garmon preemption. Do you agree that it's on point? And do we just have to disagree with it if we're going to disagree, or is there some distinction here? Well, I think there's also something that's arisen. I think you're going to have to disagree with Platt. But I also think that something has arisen in the last week in this case that I think throws the Garmon doctrine argument out the window, and that is the D.C. Circuit Court in this case, which is the NLRB case, where the NLRB said you have to put Mr. Smallwood back to work, you have to do all these things. The D.C. Circuit Court said, no, you don't, NLRB. You had your nose in something, you don't belong there. And believe it or not, even though that decision I think hurts my client personally because now he's not going to get to go back to work, I think it actually helps on this appeal. Because the argument that's made by the respondents in this case states that the reason why we have the Garmon doctrine is to prevent the second bite of the apple, and that apple has been taken away. Well, yes and no. The Garmon doctrine talks about arguably within the regulatory jurisdiction of the NLRB. It doesn't say you necessarily have a remedy. And I confess I see this D.C. Circuit case for the first time walking out on the bench 10 minutes ago. Right. And I got it on Friday. And my read of that decision is that the NLRB had to abide by the way that the grievance was settled between the ---- November 30th, which was when? It was done on November 30th, but I didn't see it until it was faxed to me on Friday. And what that case ---- Do you think notifying us on Friday would have been a good idea? I didn't. Or even this morning? I'm sorry. I didn't bring it to the attention. I received it from counsel for timeout on Friday. I didn't even know that the decision had come down. I'll ask him the question when it's his turn. Okay. I'm asking you the question. This is a case involving your client that has a bearing, you argue now, you want to argue now, has a bearing on our case. And you knew about it on Friday. You knew about it over the weekend. You knew about it this morning. And you stand here and we see it for the first time when we walk out on the bench. I'm asking you why you didn't notify us earlier if you really wanted to rely on the case, if you think it's relevant. Well, the case, the fax I received on Friday from your court from Mr. Yound said that it was being sent on to you guys, you, by overnight mail. So that's why I assume that you had it on, you received it over the weekend. And I am prepared to talk about it if that's what you'd like me to do. You may be prepared. I understand. We may or may not be. But obviously say what you need to say about it. Okay. What the case, what the case in my read of the case is, is that it said that the NLRB was obligated, couldn't give a remedy to Mr. Smallwood because it was obligated to follow the grievance that was resolved between the union and the company. And so the NLRB, the NLRB, it was improperly got involved and improperly got these remedies from Mr. Smallwood and those remedies have now been. What impact does that have on this case? Well, it goes back to. It didn't say that the NLRB couldn't have been involved if the grievance hadn't been settled the way it had been. It's not a question that, you know, this is not a matter of federal law. It's simply that this claim is now, if I understand your representation as to what this case holds, it's correct. It sounds to me like what they're saying is you had the rights, but you lost them. Federal involvement is no longer appropriate because this claim was settled. Well, the case was, the case was settled between the union and the employer, not between the NLRB and. How does that, how does that bear on your preemption argument? It would be different if the legal circuit had said this is the kind of case that the NLRB should never be involved in. But that's not what it sounds to me like they said. They sounded to me like this is the normal kind of NLRB. Well, I think that is what. In this case, it just happens to be that the case was settled. I think that, I think they said that the NLRB had jurisdiction to try to crack the agreement between the union and the company. But what they said was, you know. How does this help your case? It helps my case because the Garmon Doctrine, in my view, the case takes away what the Garmon Doctrine, the problem with the Garmon Preemption does. And that is it gives you two bites of the apple. Well, my client now has no bites of the apple. He never had his day. The day was taken away from him by the D.C. Circuit. That's why we're here. He had a case. The case, he was represented by the union. The union settled the case, probably because it determined that it was, that he was properly fired. You know, there was, there was cause for firing. Doesn't mean he didn't have rights. He did have rights. There was simply, turns out they couldn't, the union couldn't prove the case. Well, the union resolved the case, resolved it between themselves and the company. But it still doesn't even apply to the public policy tort. What does that have to do with preemption? What does it have to do with Garmon? Well, Garmon. The way the case, this particular case happens to have been resolved, it seems that we have no bearing on whether or not this is the kind of claim that's preempted. Well, I don't think that the case particularly has any bearing on this case, because we're here on a public policy tort. We're talking, and the questions that you. I thought you had said that it does. I think it does to the extent that my client did not get any relief from the NLRB, because that's what the case says. Let me ask another question about D'Angelo. I think I understand your point, although I don't think it's much of a point. Okay. I read D'Angelo. It's quite clear that at page 819 of the Pacific Report, I'm sorry, 819, volume 819, page 216, they say, We conclude that it is a violation of public policy for an employee to dismiss an employee for refusing to work under conditions unreasonably dangerous to the employee. Now, you said there's another half of D'Angelo that deals with people complaining about. And I was wondering if you could point me to where in D'Angelo that part is. I sure can, Your Honor. Let me read you a quote. Why don't you just give me a page? A page number? Sure. Yeah. I mean, I want you to read me the quote, too, but it's easier when I can follow. Sure. You got it. All right. Page 10, page 719 of the Nevada Reporter, or page 216 of the Pacific Reporter. The holding that I'm reading from is just before Head Note 13, and it says, We hold that dismissal of an employee for seeking a safe and healthy working environment is contrary to the public policy of this State. Seeking? Seeking. And from that you get protesting? I don't think he's protesting. I think he's seeking it, meaning he's attempting to. I mean, this was a case where people were dismissed for refusing to work. I don't see any facts here that involve protests or complaints or anything else. I don't. They said this is unsafe and we're not going to do it. I don't think he's protesting the conditions. I think he's engaging in conduct that public policy favors, which is writing a safety newsletter. I'm sorry. Let's talk about DeAngelo right now. Okay. Okay. DeAngelo was a case where they refused to do the work. It was just like Page, a case where they said this is unsafe, we're not going to do it. Correct. And they said in DeAngelo that is to fire somebody for refusing to do work, which is unsafe, violates public policy. Yes. But wait a minute. There's another half to DeAngelo that deals with complaining about unsafe working conditions, which is your client's case. He was not in a situation where he was ordered to do unsafe things and he refused and he got fired for that. He was fired for speaking. Okay. He said, but there's another part of DeAngelo that deals with speaking. And the speaking part is where you say seeking. Is that the word? That's correct. Okay. Just wanted to know. That's where I go with this, is that writing. Was there anything other than in DeAngelo, other than the word seeking, was there anything that involved complaining or being fired or retaliation for complaining or making public or publishing a newsletter or anything like that? In DeAngelo or in any case? In DeAngelo. Because the word seeking has to have a reference. If you want to give it experience, if really you want to give it as speaking or complaining about, then it has to have some reference that is broader than just merely refusing to do the work. I can direct you to another quote on the same page where they say, Comparable tortious discharges may arise when an employer dismisses an employee in retaliation for the employee's doing of acts which are consistent with or supportive of sound public policy and the common good. That is our case. That is exactly what we're trying to do here. Much either. Pardon me? That doesn't help you much either. I think it does because I think he's writing a newsletter and that is an act that is supportive of sound public policy and the common good. A case involving people who got discharged for refusing to do work. And, you know, no matter how much you find these general phrases in it, you've got to read what they're saying in light of the facts they have before them. D'Angelo is not a speaking case. It's not a protesting case. It is not a publishing case. It is not a case where people got fired in retaliation for complaining about anything. It was a case involving the firing for refusing to do work. Is there anything more to the case than that? Well, those are the facts of the case. But I think that the So then you find things in there that, if read expansively, could apply to Moore. Yes, Your Honor. Okay. I have one minute left. I understand your position. You've got a minute left. I'm going to save a minute for rebuttal. Thank you. You got it. We'll round it up to a minute. Okay. Thank you. Good afternoon. May it please the Court. My name is George Yund. I represent Tyma at the Appley. And let me You found out about this case. Yes. I found out about that case on, I believe it was Thursday. I received it in the mail on Friday. And I was under the mistaken impression You have a computer in your office? Yes, I do. You have a fax? Yes, I do. Did you read the case on Thursday? Yes, I did, Your Honor. Okay. So I got it in the mail on Friday. It's just sort of a way of throwing up some irrelevant It doesn't matter when you got it in the mail. You could have gotten it tomorrow in the mail. It's my mistake. That is, you had your hands on the case on Thursday. Your Honor, yes, Your Honor, I had my hands on the case on Thursday. Why is it that you did not have it in our hands on Friday? Because I assumed I would be allowed to fax it to you on Friday. And I was informed by court personnel. Believe me, I don't want to get anybody in trouble on this, but I was informed by court personnel that I could not have a fax number. The best I could do was bring copies with me, which I did, and send it overnight. Because I sent it overnight, I faxed it to Mr. Allison because I had his fax number, and I brought it with me because I wasn't sure whether your mail room When? I'm sorry? You sent it overnight when? On Friday, when I assumed that I would be able to fax it, but that was my mistake. I made a bad assumption there. I had it earlier in the week, specifically on Thursday. And I can tell you what it's about, and I'd like to tell you what it's about. And you were told by our clerk's office? Yes, Your Honor. I was. You couldn't fax it in? Yes. We tried to get a fax number. The letter I originally drafted on Friday morning said via fax. And my secretary could not get a fax number, and she had at least a couple discussions. Here's a name. And they were very helpful. Here's a name we should talk to. I don't know who you're shouting out now, but she does have a name. I can certainly get that for you. Do you know who has a name? No. I do not know. I know my secretary's name, but I don't know the court personnel who she talked to. But I can certainly find out. Okay. That's This is a You know, I am I would be surprised to learn that a lawyer of your caliber couldn't get a fax number for our court. I was surprised myself. Your Honor. Such things are done by the lawyer himself. Okay. I'm prepared to Enough said. But if you can't get this into our hands a little sooner, where are you? I'm in Cincinnati. And we do have faxes in Cincinnati. I just couldn't get a number. Honest to God, I couldn't get a number. I tried to fax it to you. And there's no reason I wanted to hide the ball from this Court about this decision. And since we're talking about This is the next time you get an answer like that from your secretary, you pick up the phone and you call the clerk of the court. You can be sure that I will, Your Honor. Okay. Whether it's our court or any other court. Yes, Your Honor. I don't want to be standing there again like this. You're right. I don't. What I would like you to do after this is to go down to our clerk's office and talk to the clerk and put her in touch with your secretary. And we're going to get to the bottom of this. Okay. If there's a problem in our clerk's office, then she needs to know about it. And if there's a problem in your office, then you need to know about it. Yes, Your Honor. I'll be happy to do that. Okay. Three and a half minutes out of your time is probably enough penalty now. Thank you. Okay. Since we're talking about that case and to talk about what the Yeah. What did the D.C. judge hold? Okay. Judge Edwards and the other two judges on that panel, Williams and Randolph, they did not disturb the board's finding that Mr. Smallwood was, in fact, engaged in protected concerted activity governed by Section 7 of the National Labor Relations Act. They vacated the board's holding as moot on that point, but they did not disturb the finding. Now, that shouldn't make any difference because under Garmon, the test is whether or not it is arguably preempted. And the point here, of course, is that Mr. Smallwood's state tort claim turns on the same set of facts that the National Labor Relations Board's complaint turned on, and that is whether or not the publication of newsletters that had to do not with something that was proprietary to Mr. Smallwood, involved only his unsafe or allegedly unsafe conditions, but the safety conditions that others in the workplace were confronted with, was arguably governed by Section 7 of the National Labor Relations Act. The board held that it was. The D.C. Circuit did not disturb that finding. So to the extent that's important, which I don't believe it necessarily is, it reinforces the argument that there is Garmon preemption, because as you noted, Your Honor, in the Platt case in the Eighth Circuit, they placed great emphasis on whether or not the plaintiff in the state tort law case had pursued remedies before the National Labor Relations Board. In this case, clearly he did. And in addition to that fact, the NLRB said that it was. It's not that persuasive, is it? Oh, I believe it is, Your Honor. Whether you do or do not happen to pursue remedies for the NLRB, I mean, whether you do or do not doesn't seem to me particularly important in deciding whether there's preemption. We're dealing with classes of claims and not with vagaries of a particular case. In this case, they might not have pursued remedies because the union was unwilling and he would have had a file on unfair labor practice case and decided it wasn't worth the time. So the specifics of a particular case just don't strike me as the stuff of which preemption is made. I agree with that point, Your Honor, that it doesn't matter whether or not he pursued the NLRA remedy. The question is whether or not his activity that he's suing about in state court is arguably protected by the NLRA. Didn't Platt go off on, say, well, when there's actual remedies and that? And to that extent, it's not very persuasive. No. I don't think they said to the extent there's actual remedies. I think what they said is to the extent that the National Labor Relations Board is, their remedies are sought by the by, in that case, the charging party. The preemptive reason, the rationale for, I'm sorry, the rationale for. What they say is to the extent that the party has sought redress for its claims from the NLRB. Okay. So it seems to focus on whether you, the party has or has not sought remedies before the NLRB. I think it goes on. That just doesn't strike me as being particularly relevant. The question, it seems to me, is could you or could you not seek them? And whether you did seek them in a particular case or not just doesn't strike me as being all that relevant to preemption. There's no question that Garmin applies even if there's not two bites at the apple, because the Supreme Court in Garmin was not concerned with whether or not there's an alternative remedy. It was concerned with whether or not the federal regulation through the National Labor Relations Board of protected concerted activity was going to be regulated only by federal law. So you're absolutely right. It shouldn't matter. And I think what you'll find when you reread Platt is that the court said, in effect, there's no question that it's arguably related or covered by the National Labor Relations Act in a case where there is an unfair labor practice charge that's filed. There's just one more additional reason to conclude, you know, it resolves any doubt about whether or not it's regulated or arguably regulated by federal law. I think that's the significance of the fact that there's an unfair labor practice charge that was filed here. Now, I'd like to highlight a couple things about the public policy tort in Nevada. David Smallwood was fired for resuming publication of a newsletter about his employer after he was told to stop. He was not fired for making safety complaints to OSHA, which distinguishes his case from a number of the ones that my opponent relies on. He was not fired for refusing to perform a hazardous job about which we've been. I'm not sure you're describing that right. At least as I understood the factual narrative, he was told not to publish another one at the very time he was told he had already distributed it in the Union Hall and he was fired for something he had already done at the time he was told not to do it again. Am I missing the facts? Yes, with all respect, Your Honor, you are. On May 24, 1999, David Smallwood was brought into the office and told, we don't want you to publish another newsletter. He sat silently and did not tell the company representatives with whom he was speaking that he already had one in the can. I understand that. Okay. But you told me he was told not to do it and he did it again. Yes. He had already done it at that time. In December of 1997, he was told not to. He was given a final warning at least twice in this case. In December of 1997, after six newsletters had appeared. But that's the earlier time. I'm talking about the last time. Yes. And the last time, you're now saying it's because he didn't say anything, not because of what he did afterwards? Well, he was told twice not to publish. One time, he was told after it was too late. I agree. That was May 24, 1999. But in December of 1997, he was warned against it. But kicked off the firing was what happened in 1999. And I think I just heard you say to me that he was told not to do it and he did it again. But that's not, in fact, what happened. He was told not to do it. He had already done it. He kept quiet and he got fired. Is that right? Yes, that's right. But he was told ñ when I say he was told not to do it, I mean, he was told not to do it in December of 1997 as well. That warning was still in effect. I understand that. Okay. That's my point about that. My point is that Nevada public policy law only relates to two things. One is refusal to perform an unsafe act, like the worker with an open surgical wound who refused to go into the cyanide pit in D'Angelo. And the other exception is where you make whistleblower complaints, where you make a complaint to OSHA or the Nevada state equivalent. Is that question in front of us now? Meaning his case was dismissed on preemption of statute of limitations grounds. It was not dismissed by the district judge on the ground that Nevada public policy does not reach this question. The district judge has not decided that question. Yes, but because your review is de novo, it was a summary judgment, I submit that there are four possible reasons on which ñ four possible bases on which this court could conclude that the district court was right. That's one of them. But it also relates to the Garmin preemption claim because, as you know, there's an exception to Garmin preemption in a case that's deeply rooted in state interest. Like, for example, that's how I can get a state court injunction against mass or violent picketing because of the exception to the Garmin rule. The point is that the Garmin rule does not accept interests like this that are speculative and interest in complaining about ñ complaining to your supervisor as opposed to Nevada. So your argument is that we need to construe the Nevada state statute to see whether in fact this is deeply rooted in a local interest because if it's not in the Nevada public policy against discharge, well, then it's not deeply rooted in a local interest. To the extent the court reaches that level of analysis on preemption, I think that's right. But I don't think you need to reach that level of analysis because the cases ñ there are lots of cases on Garmin preemption that say that complaining internally, as opposed to a whistleblower type of case, do not ñ do not invoke preemption. So there is preemption in this case because there was no deeply rooted state interest recognized in Nevada public policy. So you're right. If you need to reach that level of analysis, then the two are related. But I go back to the reason I brought it up is because there are four possible bases. One is no ñ it fails to state a claim under Nevada public policy law. Two is the statute of limitations. There is just no question in the record in this case that Mr. Smallwood was discharged. If you look at his complaint, paragraph 23 of the complaint that he filed in this case back on July 2001, it says in paragraph 23 that there were step three meetings concerning the conversion of the suspension to a discharge in June of 1999, more than two years before. By the time we get the reply brief in this case, what happened in June of 1999 is characterized as a suspension. That's just not true. If you look at the collective bargaining agreement, there's nothing in the collective bargaining agreement that says that a discharge is not final until the grievance process has been exhausted. And finally, the cases concerning administrative ñ tolling for pursuit of administrative remedies don't apply here because this was a parallel contractual remedy. I couldn't have moved to dismiss for failure to exhaust administrative remedies. This was a contractual grievance remedy that can be ñ Can you recount to me the sequence of events immediately prior to the discharge and afterwards so we can ñ Yes, Your Honor. He's called in ñ let's start with that. He's called in and said, don't you do it again. Don't you publish the letter again. And he sits there silently knowing that he already has some in the pipeline. Okay. What date was that? That was May 24, 1999. On May 25, 1999, the written final warning issued, warning him not against complaining about safety but against publishing newsletters and telling him to resort to the contractual grievance or contractual complaint mechanisms because the contract says if you encounter an unsafe condition, you have to bring it up. That happened on May 25. On May 26, the newsletter is discovered by management, and Mr. Smallwood is escorted out of the plant on that day and told on that day, May 26 ñ You're suspended. You're suspended because the contract says ñ he was told more than you're suspended. He was told you're suspended pending termination because the steelworkers contract, as many steelworkers contracts do, say that you can't terminate someone without first suspending them for five days. And that's what happened. The contract was observed. The company told him you're suspended pending discharge. And then on June 8, 1999, a letter was sent to him that said it's been converted. And then if you look in the record, I believe it's on page ñ I can get you this. I believe it's on page 234 of the appellant's excerpts of record, Exhibit 31 to Mr. Smallwood's deposition. You will see the third-step grievance that was filed over his unjust discharge. I'm sorry. This is the page ñ Page 234 of the ñ Titanium metals, Step 3, right?  Yes, Your Honor. That's the plaintiff's ñ There's a double line in the middle separating two forms. Where are you reading from? I just want to be following along. Sure. It's this document right here, page 234. Right, it has a double line in the middle separating two forms. The upper half or the lower half? I'll direct you to two places. Under Step 2 answer right at the top, the Step 2 answer to this grievance is unsatisfactory because if you look down to the next line, you'll see unjust discharge, okay? And then at the bottom in the answer that was provided by management on June 28, the very last line of what's typed in the blank, given these circumstances the discharge is warranted and this grievance is denied. There is absolutely no question either from any interpretation of the contract or interpretation of the record that this man was discharged in June of 1999. So this is now June 28, 1999, which is more than two years back from the filing of the complaint. Yes, Your Honor. What happens next after June 28? After June 28, I believe the next event that occurred was a settlement agreement that is dealt with in that case. I hate to get back on that case again. The union takes up the grievance and does it file something or? It files a demand for arbitration. A demand for arbitration, that's right. Okay. And then the demand for arbitration and the grievance itself are resolved by agreement of the parties, and that's what Judge Edwards said that the labor board should have deferred to. Anyway, your position is that arbitration is like a lawsuit. You're trying to undo something that's happened. It is not final until a finality happens before the arbitration process. No. The issue is when did his cause of action accrued? The cause of action accrued when he was discharged, not having anything to do with arbitration, because he didn't have to exhaust arbitration to pursue this state tort remedy. And the Nevada courts have held, and there's no contrary authority, that it's a two-year statute of limitations. The Ninth Circuit in Fulton had exactly the same situation involving Arizona law, where the claim was that there was a three-year statute of limitations that was based on a lawsuit that was based on a statute. And this court held in Fulton, which we cited in our papers, that that reasoning is circular, to say that you've got a public policy because there's no private right of action under a statute, and then to say that you've got a statutory statute of limitations as opposed to the personal injury two-year statute of limitations. That's just circular reasoning. Okay. Thank you very much. Thank you. You've got a minute. Counsel, are there any claims here that are not barred by the statute of limitations? I think the public policy tort is barred by the statute of limitations. You say is or is not? It is not barred by the statute of limitations. And I would say, and the basis of that is twofold. One, the entire tolling argument that was brought in that case. And there's a case I want to bring to the Court's attention. It's called Metz v. University of Nevada, Reno, 301F sub 2nd, 1247, where a professor was seeking tenure. He said, you don't get it. He then, six months later, said, will you please reconsider? And they said, no, you don't get it. And then he filed a lawsuit two years, more than two years after the first denial of reconsideration, but less than two years after the second. And the court said that's an issue, that raises an issue of fact for the jury to decide as to whether or not the statute of limitations. Is this the case you cited? The case is called Metz v. University. That's not the question I asked you. Is this the case you cited? In the briefs, no, I did not. So I'm just, I did not cite it in the briefs. So you're citing a case now that you knew about, you didn't have any brief? That's right. It's not a good thing to do. It's even worse than not. I understand. I'm not sending as recent cases as failing to. Have you heard of a 28-J letter? I understand. Yeah. Well, give, you know, put down the citation on those forms and give them to the clerk. Okay. Afterwards. I sure will. The other basis for the statute of limitations, Your Honor, is that under the three, it's a three-year statute of limitations under the statute because it's an action brought by statute. And there's case law that actually says, and it's the DeAngelo case and the Hensel v. Singers case, it says the public policy tort on this particular basis. Yeah, but the cause of action isn't created by statute. This is a common law action, isn't it? It coexists with the statute, and that's a quote, and I'm paraphrasing the ruling from the DeAngelo court and the Hensel court. It coexists with it without the public policy being held forth in the statute. But there's no Nevada statute that creates the cause of action that you're suing under. No, there's not. Okay. But the cause of action wouldn't exist but for the statute. Okay. Okay. Your time is up. Okay. Thank you. Thank you. Cases are able to stand submitted. And counsel will follow up on that matter. Yes, Your Honor. We'll next hear argument on the next case on the calendar, and I hope I get it right this time. I have the right calendar in my hand. Lutz v. Glendale Union High School District.
judges: Kozinski, W. Fletcher, Bybee